IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                              Criminal No. ELH-17-232

STANLEY RINGGOLD,
*Defendant*.

## MEMORANDUM OPINION

Stanley Ringgold, defendant, entered a plea of guilty on July 3, 2018, to the offense of conspiracy to distribute and possess with the intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846.  ECF 346; *see also* ECF 343 ("Plea Agreement").  The offense carried a mandatory minimum sentence of ten years of imprisonment.  ECF 343, ¶ 3(a).   At the time, Ringgold qualified as a career offender pursuant to § 4B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").   ECF 343, ¶ 6(b); *see also* ECF 395 ("Presentence Report" or "PSR"), ¶ 3.  As a result, the Guidelines called for a sentence of 262 months to 327 months of imprisonment.  ECF 395, ¶ 63.  However, pursuant to Fed. R. Crim. P. 11(c)(1)(C) ("C Plea"), the parties agreed to a sentence ranging between 120 months and 144 months of imprisonment.  ECF 343, ¶ 8. On September 17, 2018, the Court sentenced Ringgold to 120 months of imprisonment, with credit from July 28, 2017.  ECF 406 at 2.  Given the congressionally mandated minimum term, defendant received the lowest possible sentence that the Court could impose.  ECF 343, ¶ 3(a).

On September 30, 2022, Ringgold, who is now self-represented, filed a "Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(C)(1)(A) and the First Step Act of 2018."  ECF 565 ("Motion").  The Motion is supported by a single exhibit.  ECF 565-1.  The government opposes the Motion.  ECF 573 ("Opposition").  Ringgold submitted a

letter to the Court on October 5, 2023, renewing his request for a sentence reduction.  ECF 595.

And, on October 26, 2023, he filed a "Motion to Compel Action," asking the Court to rule on his

Motion for Compassionate Release.  ECF 600 ("Motion to Compel").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that

follow, I shall deny the Motion and deny the Motion to Compel, as moot.

## I.  Background

On August 1, 2017, a grand jury in the District of Maryland returned a seven-count Second

Superseding Indictment.  ECF 93. As to Ringgold, he and ten co-conspirators were charged in

Count One with conspiracy to distribute and possess with intent to distribute controlled dangerous

substances, in violation of 21 U.S.C. § 846.  *Id.*

As noted, Ringgold pleaded guilty to this offense on July 3, 2018.  ECF 346.  In the Plea

Agreement, the parties stipulated to the following facts, ECF 343, ¶ 6(a):

> Beginning at a time unknown, but at least as early as September 2016,
> the Defendant, Stanley Ringgold, conspired with others to obtain and distribute
> one kilogram or more of heroin at a street-level drug "shop" in the area of
> Boarman Avenue and Reisterstown Road in Baltimore City, Maryland.  During
> the period of the conspiracy the Drug Enforcement Administration (DEA)
> obtained authority to intercept the communications of the DeAngelo Keith [sic]
> ("Keith"), and confirmed that the Defendant was a member of an organization
> selling heroin in Baltimore.  While intercepting Keith's cellular telephone,
> investigators heard Keith coordinate shop operations with other members of his
> organization, which included the Defendant.  For example on January 10, 2017,
> there was a call between Keith and the Defendant where Keith called the
> Defendant to check on heroin that Ringgold was manufacturing.  The Defendant
> and Keith specifically discussed letting the heroin dry and how it should be
> mixed:  Keith said, "Five. You fucked this brown up."   The Defendant
> responded, "Nah, that's supposed to be like that.  I checked on it, that's
> supposed to be like.  That's how I want it."  Keith replied, "Man, that shits
> fucked up.  You crazy as shit, man."  The Defendant answered, "No its not
> fucked up, it's wet, yo.  The fuck you mean.  It ain't fucked up.  It's just wet.
> It's gotta dry.  Just let it sit, son.  Leave it alone."  Keith stated, "Nah. It ain't
> gonna dry. It's gonna be like . . . ."  The Defendant replied, "We got plans for
> that."  Keith said, "It's stained."  The Defendant stated, "I got plans for that. No

it's just supposed to sit.  The longer it's going to sit it's going to be alright. Because I don't even think I need it.  For real."

The parties also stipulated that "[t]he Government's evidence consists of the seizure of narcotics and narcotics paraphernalia and the recording of conversations occurring over the Defendant's and others' cellular telephones."  *Id.*  And, Ringgold "agree[d] that it was reasonably foreseeable to him that members of the conspiracy would distribute one kilogram or more of heroin."  *Id.*

In paragraph 6(b) of the Plea Agreement, the parties agreed that Ringgold qualified as a Career Offender pursuant to U.S.S.G. § 4B1.1(a).  *Id.* ¶ 6(b).  As a result, "the parties agree[d] that the Defendant's offense level is 37 and the Defendant's criminal history category is VI."  *Id.*  After deductions for acceptance of responsibility and timely notification of the defendant's intent to plead guilty, pursuant to U.S.S.G. § 3E1.1, the parties agreed that Ringgold's "final adjusted offense level is 34."  *Id.* ¶ 6(c).

Paragraph 8 of the Plea Agreement is also pertinent.  There, the parties "agree[d] pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence in the range of 120 months to 144 months of imprisonment" was the appropriate disposition.  *Id.* ¶ 8 (boldface omitted).

The PSR indicated that in 2000 Ringgold was convicted in the Circuit Court for Baltimore City on two charges of attempted murder in the second degree, for which he received an 18-year sentence, with all but five years suspended.  ECF 395, ¶¶ 23, 24.  He was also convicted of a handgun offense, for which he was sentenced to a concurrent term of five years.  *Id.* ¶ 24.  Ringgold was released on March 18, 2003, but was found in violation of the terms of his release on December 10, 2004, and returned to prison.  *Id.* ¶ 24.  Ringgold was again released on July 16, 2008, but on December 2, 2008, he was again found in violation of the terms of his probation.  *Id.*  Ringgold's case expired on December 18, 2009.  *Id.*

3

In addition, the PSR indicated that on two separate occasions Ringgold was convicted in the Circuit Court for Baltimore City of a felony drug offense. *Id.* ¶¶ 25, 26. In particular, Ringgold was convicted in 2003 of "Possess[ion] with Intent to Distribute," and he was convicted in 2011 of "Possession with Intent to Distribute Cocaine." *Id.* ¶¶ 25, 26. For the 2003 offense, he appears to have received a time-served sentence. *Id.* ¶ 25. For the 2011 offense, Ringgold received a seven-year sentence, with all but two days suspended. *Id.* ¶ 26.

According to the PSR, Ringgold had a base offense level of 30. *Id.* ¶ 16. However, because the defendant qualified as a career offender, his offense level was increased to 37, pursuant to U.S.S.G. § 4B1.1. *Id.* ¶ 17. Ringgold's final offense level was 34, because he earned three deductions for acceptance of responsibility under U.S.S.G. § 3E1.1. *Id.* ¶¶ 18, 19.

Ringgold's prior convictions resulted in a criminal history score of five points. *Id.* ¶ 27. Under the Guidelines, "a criminal history score of five establishes a criminal history category of III." *Id.* ¶ 28. However, because Ringgold was "a career offender," his criminal history category was elevated to VI, pursuant to U.S.S.G. § 4B1.1(b). *Id.* ¶ 29.

Based upon a final offense level of 34 and a criminal history category of VI, the PSR determined that Ringgold's "guideline imprisonment range" was "262 months to 327 months" of imprisonment. *Id.* ¶ 63.

In contrast, if defendant had not been a career offender, he would have had an offense level of 27 and a Criminal History Category of III. In that case, the Guidelines range would have been 87 to 108 months of imprisonment. However, under U.S.S.G. § 5G1.1(b), "the statutorily required minimum sentence shall be the guideline sentence." Therefore, the Guidelines range would have been adjusted to 120 months of imprisonment, to correspond to the mandatory minimum sentence.

The PSR recommended a sentence of 262 months of imprisonment. *Id.* at 17. The PSR explained, *id.*:

> The defendant is before the Court facing his 5th criminal conviction and having been classified a Career Offender. His criminal history comprises of [sic] violence and drug distributions. He has violated every period of supervision except for one, which he served 1 month 7 days custody with no supervision to follow. Ordinarily the guidelines would be driven the amount [sic] of drugs, but in this defendant's case, the guidelines are determined by the Career Offender enhancement.   The defendant has previously served a sentence totaling 10 years. The C Plea is well below the guideline range.

Sentencing was held on September 17, 2018.  ECF 405.  Ringgold was 36 years old at the time.  ECF 395 at 2.  I imposed a sentence of 120 months of imprisonment, dating from July 28, 2017.  ECF 406 at 2.  As noted, this corresponded to the bottom of the C Plea range and to the mandatory minimum sentence.  *See* ECF 395, ¶ 62.

On November 9, 2020, through counsel, Ringgold filed an "Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(C)(1)(A)(i)."   ECF 513; ECF 513-1 (collectively, "First Motion").  In the First Motion, Ringgold asked the Court to reduce his sentence to time served because his "sleep apnea, hypertension, hyperlipidemia, Gastro-esophageal reflux disease without esophagitis, asthma, impingement syndrome of the shoulder and gingivitis . . . place[d] him at serious risk of becoming severely ill from COVID-19."  ECF 513-1 at 1.

By Memorandum Opinion and Order of February 7, 2021, I denied the First Motion, without prejudice, on the ground that Ringgold had not exhausted his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A).  ECF 535 at 15; ECF 536.  However, I noted that, even assuming that Ringgold exhausted his administrative remedies, the sentencing factors under 18 U.S.C. § 3553(a) would have counseled against compassionate release, given his "extensive criminal history involving violence and drugs," ECF 535 at 15, and the fact that he had served only 35 percent of his sentence, and, the sentence itself was a lenient one, as it "was significantly below

the Guidelines range . . . at the bottom of the C Plea range [and] corresponded to the mandatory minimum sentence applicable to the offense." *Id.* at 16.

On September 17, 2021, Ringgold, acting pro se, filed a motion requesting the appointment of counsel to assist him in pursuing compassionate release. ECF 547. The Court then asked the Office of the Federal Public Defender ("FPD") to review the matter. ECF 553. The FPD filed a notice on November 11, 2021, stating that it did "not plan to file a motion for compassionate release on Mr. Ringgold's behalf." ECF 557.

On September 30, 2022, Ringgold, still self-represented, filed the instant Motion, asking the Court to allow him "to finish out his sentence at home" in light of, *inter alia*, "the extraordinary and compelling circumstances created by the novel coronavirus." ECF 565 at 1. The Motion is supported by a single exhibit, titled "'Administrative Remedy,'" which contains a "Response to Inmate Request to Staff Member," signed by "W.E. Mackelburg, Warden," denying Ringgold's request for a reduction in sentence. ECF 565-1.

The FPD filed a notice on November 4, 2022, stating: "The [FPD] will not be supplementing Mr. Ringgold's pro se motion or asking for appointment of counsel in this matter. Additionally, the [FPD] does not have additional documents regarding the exhaustion of administrative remedies that were not previously submitted to this Court." ECF 570.

The government opposes the Motion. ECF 573. It has appended some ninety pages of Ringgold's medical records to its Opposition. ECF 573-1–4.

Ringgold is now incarcerated at the Federal Correctional Institution, Beckley. *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed November 8, 2023). Dating from July 28, 2017, he has served about 75 months, or 63 percent, of his 120-month sentence. *See* ECF 406 at 2.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

Section 3582 of Title 18 of the United States Code was first enacted as part of the Sentencing Reform Act of 1984.  As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the Bureau of Prisons ("BOP").  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was exceedingly rare, because the BOP rarely filed motions on an inmate's behalf.  *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz,

Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013). However, as a result of the enactment of the First Step Act ("FSA") in December 2018, a federal inmate could file a motion for compassionate release directly with the court, so long as the inmate first exhausted administrative remedies. *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)); *see also United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

With the passage of the FSA, Congress "broadened" the authority of courts to grant sentencing modifications. *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule that a federal sentence is final. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021). The FSA resulted in a sea change in the law.

In particular, the 2018 FSA authorized a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Nonetheless, there are restrictions. Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Brown*, 78 F.4th at 128; *Bethea*, 54

F.4th at 831.  In other words, the analysis consists of "two steps."  *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criterion is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis."  *Jenkins*, 22 F.4th at 169.  However, as the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement").  Critically, as discussed below, amendments to the Policy Statement took effect on November 1, 2023.  Prior to the amendments, however, the Policy Statement began: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ."  U.S.S.G. 1B1.13 (2021).  Interpreting this language in *McCoy*, 981 F.3d at 282, the Fourth Circuit stated that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  Therefore, on the basis of that earlier text, the Court held: "When a defendant

exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *McCoy*, 781 F.3d at 281.  As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

As indicated, the Fourth Circuit based its holding in *McCoy* and other cases on a version of the Policy Statement that has since been amended.  *See* Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3, 2023) (providing notice of amendments to Congress).  In particular, as a result of the amendments that took effect on November 1, 2023, the Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added).  Thus, the Sentencing Commission has made the Policy Statement expressly applicable to defendant-filed motions under § 3582(c)(1)(A).  *Cf. McCoy*, 981 F.3d at 282.

Therefore, it appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that "§ 1B1.13 is not an 'applicable' policy statement," is no longer consistent with the Guidelines.  This is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A).

A court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).  The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of

imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

(1) (A) extraordinary and compelling reasons warrant the reduction; or

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *Id.* § 1B1.13(b)(1)–(6). These are: certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated, *id.* § 1B1.13(b)(1); the defendant's age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer, *id.* § 1B1.13(b)(4); the defendant received an "unusually long sentence," *id.* § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Prior to the amendments, the district court was obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2396 (2022); *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *United States v. Brice*, 2022 WL 3715086, at *2 (4th Cir. Aug. 29, 2022) (per curiam). Where appropriate, the district court had to "account not only for the circumstances at the time of the original offense but also for

significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3.  However, such developments did not warrant a recalculation of the Guidelines.  *Troy*, 64 F.4th at 184.

Notably, however, § 1B1.13(c) of the Policy Statement now specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."  Nonetheless, "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction."  *Id.*

Section 1B1.13(d) of the Policy Statement, which limits the weight a court may assign to a defendant's rehabilitation while serving a sentence, is also relevant.  It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.*  "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  *Id.*

Even if the defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*,

916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors).

Those "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)). As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500). And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Meza v. United States*, ___ U.S.

___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).  For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling."  *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.  In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion."  *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d

at 189.  In addition, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision."  *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

### III.  COVID-19[1]

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.  *United States v. Pair*, ___ F. 4th ___, 2023 WL 6989947, at *1 (4th Cir. Oct. 24, 2023).  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[2]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19, which is extremely contagious, caused "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  For a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).  For example, businesses and schools were closed or operated on a limited basis, in an effort

---

[1] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

to thwart the spread of the virus.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.  As the Fourth Circuit recently explained, in the early months of 2020, "a new reality set in.   Nations   around   the   world   announced   stringent   limitations   on-in  person interaction . . . businesses ground to a halt; and death tolls mounted."  *Pair*, 2023 WL 6989947, at *1.

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*   Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Philibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, REUTERS (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on

which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying

medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  That is, a court  may not adopt a rule "that conditions not listed in the CDC's highest category, no matter the conditions of the prison and risk of infection, can never qualify as extraordinary and compelling reasons to reduce a sentence." *Id.* at 195 (internal quotation marks omitted).  Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam).  In any event, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from COVID-19." *Bethea*, 54 F.4th at 832.

## B.

As noted, the coronavirus is "highly contagious." *Pair*, 2023 WL 6989947, at *9.  At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.* at *9.  Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 2023 WL 6989947, at *5.

However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2.  Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-

18

18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020), https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social

distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division,

issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

**C.**

Although there is no cure for the coronavirus, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of the illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW.  It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020.  Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since that time.  According to the BOP, 347,534 doses of the COVID-19 vaccine have been administered to inmates and staff, and booster shots are available to inmates in accordance with CDC guidance.  *See COVID-19: Coronavirus*, BUREAU OF PRISONS, https://www3.fed.bop.gov/coronavirus/index.jsp (last visited Nov. 1, 2023).  And, as of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total

U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States.  Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic."  Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent.  *See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 1, 2023), https://covid.cdc.gov/covid-data-tracker/#datatracker-home. However, there are no "open cases" of COVID-19 at FCI Beckley, where Ringgold is one of about 1,670 inmates.  *See Inmate COVID-19 Data*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData (last updated November 7, 2023).

## IV.  Discussion

### A.

As noted, the Court denied Ringgold's First Motion for Compassionate Release on the ground that he had not provided evidence that he exhausted administrative remedies.  ECF 535 at 15.  In the instant Motion, Ringgold asserts that he has since exhausted administrative remedies by "fil[ing] a request for compassionate release to W.E. Mackelburg, BOP Warden, which was denied on May 28, 2021."  ECF 565 at 12.  Appended to the Motion as Exhibit 1 is a copy of a letter signed by "W.E. Mackelburg, Warden."  ECF 565-1.  It states: "This is in response to your Inmate Request to Staff Member dated February 19, 2021, [in which] you requested a reduction in sentence (RIS) based on concerns about COVID-19.  After careful consideration, your request is denied."  *Id.* at 2.  In its Opposition (ECF 573), the government concedes that Ringgold has now exhausted his administrative remedies.  *Id.* at 2.

I am satisfied that Ringgold has met the exhaustion requirement under 18 U.S.C. § 3582(c)(1)(A).

### B.

Ringgold argues that there are two extraordinary and compelling reasons for reducing his sentence.  ECF 565 at 12, 18, 27–31.  First, Ringgold asserts that he has a number of medical conditions—hypertension, asthma, sleep apnea, gastroesophageal reflux disease, and gingivitis—that increase his risk of contracting severe COVID-19.  *Id.* at 12, 15.  Second, he argues that, in light of the Fourth Circuit's holding in *United States v. Norman*, 935 F.3d 232, 237–38 (4th Cir. 2019), to the effect that conspiracy in violation of 21 U.S.C. § 846 is not a "controlled substance offense" for purposes of U.S.S.G. § 4B1.2(b), he would not qualify as a career offender if he were sentenced today.  *Id.* at 27–28.  Instead, according to Ringgold, his "Final Offense Level [w]ould

now be at level 27," with "a Criminal History Category [of] III," so that his "guideline imprisonment range [would be] 87–108 months." *Id.*

Ringgold does not address the sentencing factors under 18 U.S.C. § 3553(a).  Nor does he address the fact that, notwithstanding any change in career offender status, the Court imposed the congressionally mandated minimum sentence of ten years of imprisonment.  In other words, the career offender designation did not affect the length of the defendant's sentence.

The government acknowledges that Ringgold "has medical conditions that can establish extraordinary and compelling reasons for compassionate release," namely "asthma and hypertension." *Id.* at 16, 18.  Nonetheless, the government argues that Ringgold "no longer presents an 'extraordinary and compelling reason' because he has been vaccinated." *Id.* at 18.[3]  In support, the government cites a number of cases in other jurisdictions that, in the government's view, establish that district courts "overwhelming agree" that the vaccine significantly reduces or eliminates the risk of severe disease. *Id.* at 20–22.  In addition, the government notes that although Ringgold once "contracted COVID-19," he "apparently recovered from it without significant consequence." *Id.* at 25.

The government also argues that the change in the law effected by *Norman*, 935 F.3d 232, under which Ringgold no longer qualifies as a career offender, does not provide an extraordinary and compelling reason for relief.  In particular, the government asserts that "the *Norman* decision is not retroactively applicable on collateral review, and compassionate release should not serve as a back door for claims that would otherwise not be cognizable."  ECF 573 at 31–32.

---

[3] The government does not provide a citation in support of its statement that Ringgold has been vaccinated.  However, the Court notes that a BOP medical screening summary appended to the government's Opposition indicates that Ringgold received two doses of the Pfizer COVID-19 vaccine, one on August 19, 2021, and the second on September 9, 2021.  ECF 573-3 at 49.

Finally, the government argues that the sentencing factors under 18 U.S.C. § 3553(a) counsel against a reduction in sentence. *Id.* at 32–34. According to the government, Ringgold's 120-month sentence was just punishment for his conduct, because he "was engaged in large-scale drug trafficking enterprise [sic] involving heroin, fentanyl, and carfentanil." *Id.* at 32–33. The government also maintains that reducing Ringgold's sentence would not serve the Court's interests in deterrence, promoting respect for the law, and protecting the public from further crimes. *Id.* at 33.

I turn to consider whether defendant has identified any extraordinary and compelling reasons for a reduction in sentence.

## C.

Ringgold contends that the change in the law effected by *Norman*, 935 F.3d 232, provides an extraordinary and compelling reason for compassionate release. In *Norman*, 935 F.3d at 237, the Fourth Circuit held that a drug conspiracy conviction under 21 U.S.C. § 846 does not constitute a "controlled substance offense" within the meaning of U.S.S.G. § 4B1.2(b). As I recognized in my Memorandum Opinion of February 7, 2021 (ECF 535 at 16), and as Ringgold correctly observes in the Motion, the Fourth Circuit's holding in *Norman* means that Ringgold no longer qualifies as a career offender. ECF 535 at 16; ECF 565 at 28. As a result, if sentenced today, Ringgold's final offense level would be 27 and his criminal history category would be III. Ordinarily, the recommended sentence under the Guidelines would be 87–108 months of imprisonment. ECF 535 at 16. However, under U.S.S.G. § 5G1.1(b), Ringgold's recommended sentence under the Guidelines would be adjusted upward to 120 months, to correspond to the congressionally mandated minimum sentence.

Moreover, under the circumstances here, the newly amended Policy Statement clearly forecloses a grant of relief on the basis of a change in law. In particular, U.S.S.G. § 1B1.13(c), titled "Limitation on Changes in Law," provides that, "[e]xcept as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." In turn, U.S.S.G. § 1B1.13(b)(6) provides:

> If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

That is, under U.S.S.G. § 1B1.13(c) and U.S.S.G. § 1B1.13(b)(6), a change in the law cannot provide an extraordinary and compelling reason for relief, unless, *inter alia*, a defendant "has served at least 10 years of" his sentence. U.S.S.G. § 1B1.13(b)(6). The Sentencing Commission has explained that, by "limit[ing] the application of this provision [concerning unusually long sentences] to individuals who have served at least 10 years," it intended "to address administrative concerns" by significantly restricting the number of defendants who could seek relief based on a change in the law. 88 Fed. Reg. at 28259; *see also id.* (observing that, "between fiscal year 2013 and fiscal year 2022, fewer than 12 percent (11.5%) of all offenders were sentenced to a term of imprisonment of ten years or longer.").

As noted, Ringgold was sentenced to a term of imprisonment of 120 months, or ten years, dating from July 28, 2017. ECF 406 at 2. The Court was required to impose a sentence of at least ten years, up to life, pursuant to 21 U.S.C. §§ 846, 841(b)(1)(A). *See* ECF 343, ¶ 3(a). The defendant has served about 75 months, or 63 percent, of this sentence. *Id.* Because the defendant

26

has not served "at least 10 years of" his sentence, U.S.S.G. § 1B1.13(b)(6), he may not rely on the change in law effected by *Norman*, 935 F.3d 232, as a ground for relief. *See* U.S.S.G. § 1B1.13(c).

Ringgold also asserts that his various health conditions, which include asthma and hypertension, provide an extraordinary and compelling reason for relief, because they place him at greater risk of becoming seriously ill with COVID-19. ECF 565 at 12, 15.

Section 1B1.13(b)(1) of the Policy Statement identifies four circumstances under which a defendant's medical condition may provide an extraordinary and compelling reason for relief. *See* U.S.S.G. § 1B1.13(b)(1)(A)–(D). First, under § 1B1.13(b)(1)(A), "a terminal illness (*i.e.,* a serious and advanced illness with an end-of-life trajectory)," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-state organ disease, and advanced dementia," may provide an extraordinary and compelling reason for relief. Second, under § 1B1.13(b)(1)(B), an extraordinary or compelling reason may exist if the defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of . . . aging," and such condition or impairment "substantially diminishes" the defendant's ability to care for himself. Third, under § 1B1.13(b)(1)(C), an extraordinary or compelling reason may exist if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death."

Finally, under § 1B1.13(b)(1)(D), relief may be warranted if:

(i)     the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii)    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result

27

> of exposure to the ongoing outbreak of infectious disease or the ongoing
> public health emergency described in clause (i); and

(iii)     such risk cannot be adequately mitigated in a timely manner.

In my view, none of the preceding circumstances exists in Ringgold's case.  Ringgold does not assert, nor is there is any evidence to suggest, that he is suffering from a terminal illness, *see id.* § 1B1.13(b)(1)(A), or that his ability to care for himself is "substantially diminishe[d]" by a "serious physical or medical condition," "serious functional or cognitive impairment," or his age. *Id.* § 1B1.13(b)(1)(B).  Nor is there any basis on which to conclude that Ringgold "is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." *Id.* § 1B1.13(b)(1)(C).

In fact, the health records appended to the government's Opposition tend to show that the care Ringgold has received while incarcerated has effectively treated his health conditions.  *See, e.g,* ECF 573-3 at 9, 21.  For example, a BOP "Health Services" report dated July 7, 2022, states, with respect to Ringgold's hypertension: "Inmate confirms that he is taking his medications as currently prescribed. . . . BP [blood pressure] is within clinical target parameters." *Id.* at 9.  In addition, with respect to Ringgold's "pulmonary/respiratory" condition, the report states: "Inmate states he is compliant with his medications and feels that they are effectual at this time." *Id.* Another report, dated March 8, 2022, states that, to treat his asthma, Ringgold uses "albuterol MDI 1–2 x month, or prior to exercise with good response." *Id.* at 21 (emphasis added).

Nor has Ringgold demonstrated an entitlement to relief under § 1B1.13(b)(1)(D) of the Policy Statement, which provides that, in some circumstances, a greater vulnerability to serious medical complications caused by an infectious disease can provide an extraordinary and compelling reason for a sentence reduction.  As noted, Ringgold asserts that compassionate release

is warranted because his asthma and hypertension place him at greater risk of developing severe COVID-19. ECF 565 at 12, 15. I agree that, according to CDC guidance, Ringgold's asthma and hypertension likely place him "at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of" COVID-19. U.S.S.G. § 1B1.13(b)(1)(D)(ii); *see People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8. Indeed, the government appears to concede as much. ECF 573 at 16.

Notably, as of the time of writing of this Memorandum Opinion, there are no "open cases" of COVID-19 at F.C.I. Beckley, where Ringgold is one of about 1,670 inmates. *See Inmate COVID-19 Data*, *supra*, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData. Therefore, there is no basis on which to conclude that Ringgold is "is housed at a correctional facility affected . . . by (I) an ongoing outbreak" of COVID-19. U.S.S.G. § 1B1.13(b)(1)(D)(i). Nor has the Court been provided with any reason to think that FCI Beckley is "imminently at risk of" being so affected. *See id.*

Moreover, there are good reasons to think that Ringgold's risk of severe disease has been, or could be, "adequately mitigated in a timely manner." *Id.* § 1B1.13(b)(1)(D)(iii). Inmates at FCI Beckley are required to wear face coverings "at all times in all indoor environments" and "are tested for SARS-CoV-2 when they are symptomatic, asymptomatic but exposed, during movements, and when surveillance is needed." *See FCI Beckley*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/bec/ (last accessed Nov. 2, 2023) (stating that FCI Beckley maintains "Level 1 Operations"); *COVID-19 Modified Operations Plan & Matrix*, FEDERAL BUREAU OF PRISONS, https://www3.fed.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last accessed

Nov. 2, 2023) (describing "Level 1 Operations" and "General Modifications").  In addition, it is the BOP's policy to respond to increased levels of infection by taking further precautions, including "[l]imit[ing] capacity" at various prison facilities, such as the laundry and law library, "to allow for social distancing." *COVID-19 Modified Operations Plan & Matrix*, *supra*, https://www3.fed.bop.gov/coronavirus/covid19_modified_operations_guide.jsp.  And, as noted, there are currently no "open cases" of COVID-19 at FCI Beckley, nor have there been any "Covid Related Deaths." *See Inmate COVID-19 Data*, *supra*, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData.  In my view, these facts are strongly probative of "adequate[] mitigat[ion]." *See* U.S.S.G. § 1B1.13(b)(1)(D)(iii).

### D.

My conclusion that Ringgold has not identified an extraordinary and compelling reason for relief is, by itself, sufficient grounds to deny the Motion.  But, even assuming that defendant has established an extraordinary and compelling reason, I conclude that the sentencing factors under 18 U.S.C. §3553(a) counsel against a reduction in Ringgold's sentence.

As noted in my Memorandum Opinion of February 7, 2021, Ringgold received the mandatory minimum term of imprisonment for his violation of 21 U.S.C. § 846.  ECF 535 at 16. He has served less than two-thirds of this sentence.  *See* ECF 406 at 2.   In my view, the Court's interest in promoting respect for the law, providing just punishment, deterring criminal conduct, and protecting the public from future crimes of the defendant would be ill-served by reducing Ringgold's sentence to one significantly below the mandatory minimum sentence for the offense he committed.  *See* 18 U.S.C. § 3553(a)(2)(A)–(C).

In addition, Ringgold's "history and characteristics" do not make a strong case for relief. *Id.* § 3553(a)(1). In general, over the years, the criminal justice system showed leniency to defendant. Yet, the crime for which Ringgold is now imprisoned is his third drug-related offense and his fifth criminal conviction. *See* ECF 395 at 6–8. In short, Ringgold did not take advantage of the leniency extended to him by conforming his conduct to societal expectations.

Moreover, Ringgold has committed two infractions while incarcerated: "use of drugs/alcohol" and "assault w/o serious injury." ECF 573-4. Although I am mindful that a criminal history and prison disciplinary record do not disqualify an inmate otherwise deserving of relief from receiving compassionate release, Ringgold's criminal history and prison record are troubling, and confirm my determination that a sentence reduction is inappropriate at this time.

In sum, even if I were to determine that Ringgold presented an extraordinary and compelling reason for relief, I would still conclude from my assessment of the § 3553(a) sentencing factors that a reduction in sentence is unwarranted.

## V.   Conclusion

For the foregoing reasons, I shall deny the Motion, without prejudice to Ringgold's right to file another motion, if warranted. And, I shall deny the Motion to Compel, as moot.

An Order follows, consistent with this Memorandum Opinion.


Date: November 8th, 2023                                 _____/s/_____
                                                         Ellen L. Hollander
                                                         United States District Judge